IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | :     CASE NO: 1:24-CR-151-2-ELR |
| v. | : |
| ESTELA GONZALEZ, | : |
|     Defendant. | : |

# DEFENDANT'S SENTENCING MEMORANDUM

Defendant Estela Gonzalez ("Mrs. Gonzalez") respectfully submits this Sentencing Memorandum to assist the Court in calculating the applicable Advisory Guidelines sentencing range and determining a reasonable sentence pursuant to 18 U.S.C. § 3553(a) that is sufficient, but not "greater than necessary." In this case, the parties agree that a sentence of time served is a reasonable sentence.

## INTRODUCTION

In May of 2023, Mrs. Gonzalez and her husband were charged in a sixteen-count indictment alleging alien smuggling, sexual abuse, and the forced labor of their employees, several of whom were undocumented or were working at the Gonzalezes' restaurant, Sabor a Mexico, pursuant to a work visa. The charges in the indictment primarily relied on the statements of several former workers of Sabor, detailed in the PSR. The Government produced voluminous discovery, reflecting an expansive investigation to corroborate these statements.

The Defense conducted its own investigation, interviewing numerous witnesses, including some of the alleged victims and their friends and coworkers, and obtaining photographs, social media evidence, electronic messages, and financial records. This evidence contradicted several of the allegations made by the Gonzalezes' former workers, including the allegations of forced labor. The Government eventually agreed to dismiss the indictment and entered into a plea agreement with Mrs. Gonzalez in which she agreed to plead guilty to one count of alien harboring in exchange for the Government's recommendation to a binding sentence of time served pursuant to Rule 11(c)(1)(C).

The PSR calculates a total offense level of 18 with a sentencing range of 27 to 33 months. (PSR, p. 37). Counsel for Mrs. Gonzalez contends that the total offense level should be 13 with a range of 12 to 18 months. In dispute is the application of two sentencing enhancements. Even if the PSR's calculation is adopted by the Court, however, the parties agree that a sentence of time served is the appropriate sentence under § 3553(a).

## THE DEFENSE'S INVESTIGATION

The parties reached the agreed-upon resolution after the defense produced a significant amount of evidence. The defense interviewed more than 30 individuals, primarily former and current employees that worked for the Gonzalezes alongside

the alleged victims, but also business owners, customers of Sabor a Mexico, and others who worked with, lived with, and/or socialized with the alleged victims.

The defense also filed a motion to depose over 20 employees of Sabor a Mexico who were scheduled to leave the U.S. after their work visas expired—having denied that they were victims of exploitation when interviewed by agents, they were not eligible for the legal immigration status conferred on the alleged victims. The parties deposed three of these employees prior to their departure, and their testimony is consistent with the statements obtained by the other defense witnesses.[1] Contrary to the allegations that employees were forced to work excessive hours in poor conditions, and for no pay, the witnesses disputed that workers were required to work 15-hour days and stated that workers were allowed to take breaks whenever they wanted and could even leave work early. [2]

In fact, the deposed employees were clear that anyone could own a vehicle and travel anywhere they wanted. One former employee who knew a number of the alleged victims explained that the alleged victims would go on "*road trips to Atlanta or anywhere else*" and that three of the alleged victims "*actually had their*

---

[1] In an effort to protect the privacy of the alleged victims and to comply with the Court's protective order, Counsel will file Exhibit 1-4 under seal.

[2] See, Exhibit 1 (Depo. of Sandibet Dominguez, p. 12-16); Exhibit 2 (Depo. of Alejandro Guzman at 17-20); Exhibit 3 (Depo. of Fernando Lopez-Perez, p. 12-17).

*own cars.*"³ These statements were consistent with those of the numerous other former employees who were interviewed by the defense, as well as by the alleged victims' social media profiles.

The defense provided the Government with numerous pictures and videos provided by former and current employees, from the alleged victims' social media accounts, and from other sources reflecting a positive work environment. The defense also provided videos and pictures showing that the Gonzalezes frequently threw parties for their employees, including at their own home.⁴

Moreover, the defense obtained financial records contradicting claims that the alleged victims were underpaid. Wire transfer records revealed that the alleged victims and other Sabor employees frequently sent money back to their families in Mexico.⁵ Exhibit 5 is a spreadsheet of the ten alleged victims listed in the original indictment and the total amount of wires they sent back to Mexico during periods of time that they worked at Sabor. As one example, AV10 sent $14,800 back to Mexico over four months (or $3,700 per month).

---

³ See, Exhibit 3 (Depo. of Fernando Lopez-Perez, p. 19).

⁴ See, Exhibit 4 (Photographs of employees including alleged victims).

⁵ The defense obtained this information independently. After providing the information to the Government, the Government subsequently obtained and produced additional wire transfer records relating to its alleged victims.

Former employee Fernando Lopez-Perez, a visa worker, explained that he often made more than $200 per day on tips, that he also received minimum wage, that he was paid every two weeks via check, and that he received a W-2 to do his taxes.[6] Former employee Alejandro Guzman, also a visa worker, chose to remain in the kitchen. He testified that he made $2,000 every two weeks and that he was paid via check.[7]

In addition to the evidence obtained through the defense's independent investigation and witness interviews, information the Government subsequently obtained in its investigation contradicted several of the allegations being made against the Gonzalezes. In paragraph 155, the PSR describes an alleged incident where the Gonzalezes went to a restaurant called Los Mariachis to demand repayment from former employees who left Sabor to work there, and that the "shift manager" (another Government witness, L.A.), called the police to request that a criminal trespass be issued against the Gonzalezes.

The defense interviewed the owners of Los Mariachis, Paty and Jose Garcia, and they tell a very different story. In fact, Mrs. Gonzalez and her husband were explicitly allowed to go to the restaurant to speak to their former employees (as reflected in Mrs. Gonzalez's Facebook records that the Government obtained).

---

[6] See, Exhibit 3, p. 8-9, 12.

[7] See, Exhibit 2, p. 14-15.

Moreover, Paty described a civil discussion between the Gonzalezes and the two employees, and it was not until much later, after the restaurant had closed, that L.A. came to the restaurant and called the police. Paty made clear that L.A. was not a manager and in fact did not even work at that location. Paty was also completely unaware that the police had been called to her restaurant.

**OBJECTIONS TO THE PROPOSED ENHANCEMENTS**

As reflected in the plea agreement between the parties, Mrs. Gonzalez has stipulated to a base offense level of 12 and a 3-point enhancement for harboring 6-24 unlawful aliens, and Mrs. Gonzalez has fully accepted responsibility for harboring unlawful aliens by hiring them and providing them transportation and housing while working at Sabor a Mexico.

Mrs. Gonzalez has objected to two proposed enhancements set forth in the PSR, as there is independent, credible evidence contradicting the allegations underlying the enhancements. Counsel has provided that evidence to probation and the Government.

1. <u>The enhancement under § 2L1.1(b)(7)(B) for "sexual abuse."</u>

Mrs. Gonzalez objects to a four-level enhancement under § 2L1.1(b)(7)(B) based on the allegation that she caused anyone "*serious bodily injury*" by "*conduct constituting criminal sexual abuse under 18 USC § 2242*." (PSR, par. 138). The PSR proposes this enhancement based on the allegation that AV10 was required to

6

have sex with Mrs. Gonzalez and Mr. Gonzalez and that she was afraid that she would be deported if she did not comply.

  A. <u>The allegation against Mrs. Gonzalez</u>

AV10 alleged that she was taken to a hotel by the Gonzalezes and forced to engage in sex that was non-consensual. This allegation, however, is disputed by Alexa Rodriguez, a former Sabor employee. Ms. Rodriguez explained that she was actually involved in this sexual encounter and that it was a consensual foursome. Ms. Rodriguez was clear that the sexual encounter was completely consensual, and that, in her interactions with AV10 at the restaurant thereafter, AV10 was always cheerful and in good spirits.

During its investigation, the defense also obtained WhatsApp messages between Mrs. Gonzalez and AV10 reflecting a consensual sexual, if not romantic, relationship. On March 26, 2022, for instance, AV10 sent Mrs. Gonzalez <u>a twelve second video of two women and one man engaged in sexual activity</u>. Under the video, AV10 wrote: "*Mire me acorde de usted*" and "*Senora bonita*." (translation: "*Look I remember you pretty lady*.")

Moreover, the defense obtained evidence reflecting that AV10, like the other alleged victims in this case, had a strong motivation to fabricate, or at least exaggerate, her allegations against the Gonzalezes. Ana Karina, a former business partner of Mr. Gonzalez, testified at Mrs. Gonzalez's detention hearing. Ms.

Karina testified that she briefly operated an Italian restaurant with G.O., a former Sabor employee and Government witness in this case. G.O. told her that he was helping the Government investigate Mr. Gonzalez, who he had known for almost 20 years, and that he did not care if Mr. Gonzalez went to prison since all he cared about was "*having my documentation.*"[8]

According to Ms. Karina, G.O. told her about AV10's involvement in this case. Specifically, G.O. told her that the investigating agents kept telling him that they needed "*more proof,*" so G.O. "*had to go pick [AV10] up because he had to let her know what to say [to the Government].*"[9]

Even taking AV10's statements at face value, her allegations of sexual abuse themselves suggest that Mrs. Gonzalez was kept in the dark about whether their sexual encounters were non-consensual. For instance, her interview summary states that "*EFRAIN kept telling [AV10] that she had to 'please the boss lady', referring to ESTELA*" and that "*EFRAIN instructed [AV10] to send ESTELA messages saying that she wanted to be with her sexually.*" Thus, even if AV10's

---

[8] Recording of Detention hearing (05/28/2023 at 03:08:43); Counsel notes that the defense also obtained information reflecting that G.O. has an active warrant for his arrest in Mexico for robbery, a powerful incentive for him to claim legal status as a victim in this case.

[9] Recording of Detention hearing (05/28/2023 at 03:10:45)

statements are true, they do not suggest that Mrs. Gonzalez was aware that AV10 was being abused.

### B. Other sexual abuse allegations

AV10 made other allegations against just Mr. Gonzalez. She claimed that Mr. Gonzalez would stop by AV10's home and sexually abuse her. Sandibet Dominguez, a former employee who lived with AV10, testified that she never witnessed or even heard of such conduct.[10] At her deposition, Dominguez further testified that AV10 never complained about the Gonzalezes sexually harassing her.[11]

AV10 also accused Mr. Gonzalez of sexually abusing her in the refrigerator at the restaurant. AV10 told law enforcement that Alejandro Martinez Guzman, her close friend and Sabor employee, witnessed this abuse. Guzman, however, was deposed by the parties and denied that this event ever occurred.[12]

### 2. +2 levels pursuant to § 2L1.1(b)(8)(A)(i) for detention through threats

Paragraph 139 of the PSR provides a two-level enhancement, alleging that "*[t]he victims were threatened…if they did not pay off their debts. They were told they would be deported.*" § 2L1.1(b)(8)(A)(i) states that "[i]f an alien was

---

[10] Transcript of Detention Hearing (06/28/2023, p. 25)

[11] Exhibit 1 (Depo. of S. Dominguez, p. 30-32)

[12] Exhibit 2 (Depo. of A. Guzman, p. 33-34, 74)

involuntarily detained through coercion or threat, or in connection with a demand for payment, (i) after the alien was smuggled into the United States… increase by two levels."

The PSR appears to recommend this enhancement based on its allegation that Mrs. Gonzalez threatened to deport some employees if they didn't pay alleged "smuggling debts." As best as Counsel can tell, the PSR sets forth six (6) paragraphs which allege that Mrs. Gonzalez threatened a specific person with deportation. (PSR, par. 16, 18, 46, 91, 111, 117). In contrast to the allegations against her husband, however, none of these paragraphs claim that any alleged threat of deportation by Mrs. Gonzalez *was in connection* with the repayment of debts (smuggling or otherwise). For this reason, the enhancement should not apply.[13]

---

[13] Paragraph 16: "…*if they did not work or if they quit they would be deported*."

Paragraph 18: "… *the employee had to work 15 hours and, if they were unable to do so, they would be fired and deported*."

Paragraph 46: "… *Gonzalez threatened the employees she could get them deported if they left Sabor*."

Paragraph 91: "… *if [employee] didn't continue working, she would call immigration and cancel the visa so [employee] would be deported*."

Paragraph 111: "… *threaten[ed] employees about being deported*."

Paragraph 117: "… *advised if he quit, she would have him deported*."

And while the PSR appears to take issue with the fact that Mrs. Gonzalez told employees she would cancel their visas if they quit their jobs, it is a cold, hard truth that employers are required to report the departure of any H-2B worker (whether the employee quits or is fired) and that such worker will likely be deported. Indeed, the Department of Labor has issued the following directive to employers:

> *The employer must notify DOL if any H-2B or corresponding worker separates from the job for any reason before the end of the job order. The notification must be made in writing and no later than 2 days after the separation is discovered by the employer. Similarly, the employer must also notify DHS of such separation of an H-2B worker.*[14]

Accordingly, there was nothing improper with Mrs. Gonzalez telling these employees that their visas would be canceled if they quit their jobs or were fired. Moreover, even if Mrs. Gonzalez's statements can be construed as a "threat," there was no "involuntary detention" of the alleged victims in that the alleged threats complained of were not to keep the workers detained, but rather, to fire them or deport them. Such a statement cannot be said to cause an "involuntary detention," and there is ample evidence from defense witnesses and other evidence reflecting

---

[14] See, https://www.dol.gov/agencies/whd/fact-sheets/78-h2b-overview

that the employees were free to come and go from the restaurant and their residences whenever they desired.[15] For these reasons, this enhancement should not apply.

## 18 U.S.C. § 3553(a) FACTORS

As the Court is well aware, the Guidelines are advisory, and the Court must ultimately impose a sentence that is "sufficient, but not greater than necessary" after considering the sentencing factors under 18 U.S.C. § 3553(a). Among the factors under § 3553(a), the Court is required to consider: 1) the nature and circumstances of the offense; 2) the history and characteristics of the defendant; 3) the need for the sentence imposed to afford adequate deterrence to criminal conduct, and 4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

---

[15] This is a different situation from where Courts have applied this enhancement. See, United States v. Rocha-Guajardo, 772 Fed. App. 229, 230 (5th Cir. 2019) (unpublished), finding the enhancement applied where the defendant brandished a firearm and pistol whipped a migrant who attempted to escape; United States v. DeLeon, 484 Fed. App. 920, 934 (5th Cir. 2012) (unpublished), finding the enhancement proper where a smuggler boarded up and padlocked a stash house to prevent migrants from escaping.; United States v. Andres, 666 Fed. App. 621 (9th Cir. 2016) (unpublished), finding the enhancement proper where the victim believed she would simply be recaptured if she attempted to flee.

1. Nature and Circumstances of the Offense

Mrs. Gonzalez has fully admitted to the offense charged in the Information. She employed workers that she knew were in the country illegally and provided them with housing and transportation.[16] While any violation of federal law is a serious matter, Mrs. Gonzalez's offense is a far cry from the typical case in federal court, which often involve large quantities of dangerous drugs, millions in fraud or other financial crimes, or heinous sex offenses. The crux of Mrs. Gonzalez's harboring charge is that she aided the alleged victims, who were unlawful aliens, to remain in the U.S. without detection.

At the same time, Mrs. Gonzalez helped to run the restaurants, but it was Mr. Gonzalez who was the primary operator. The restaurants were in Mr. Gonzalez's name, and he oversaw the day-to-day functions. Mrs. Gonzalez's time at the restaurants was limited. One visa worker, Sandibet Dominguez, testified in her deposition that Mrs. Gonzalez was at the restaurant "*[o]nce a week maybe*."[17] Mrs. Gonzalez's daughter, Aylin, similarly testified before this Court that her mother worked "*more at home*" and mostly "*makes sure that all the inventory and*

---

[16] According to the Department of Homeland Security, an estimated 11 million unauthorized immigrants were living in the United States on January 1, 2022. See, https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf

[17] See, Exhibit 1, p. 15.

*everything for the restaurant is set.*"[18] Likewise, it was Mr. Gonzalez who was at the restaurant on a daily basis, primarily handled recruiting employees from Mexico, and who carried the notebook allegedly listing smuggling debts as referred to in paragraph 23 of the PSR.[19]

Regardless of Mrs. Gonzalez's role in running the restaurant, the defense obtained evidence from several sources reflecting that Mrs. Gonzalez was generous with employees and genuinely cared for them. The pictures, videos, and witness statements provided to the Government and probation reflect that Mrs. Gonzalez threw parties and bought cakes for employees on their birthdays, loaned her personal vehicle to employees, helped employees obtain their driver's licenses, and more. The Facebook messages produced by the Government also reflect that Mrs. Gonzalez was genuinely friends with many of the employees now making accusations, even socializing with them outside of work at bars and restaurants.

Sandibet described Mrs. Gonzalez as a good boss who would "*pitch in and help us bus the tables.*"[20] Alejandro Guzman testified that Mrs. Gonzalez would loan her car to employees for personal trips and that she and her husband often

---

[18] Transcript of Detention hearing (06/28/2023, p. 63)

[19] Notably, Mrs. Gonzalez was only charged in the initial indictment with one count of alien smuggling whereas Mr. Gonzalez was charged in five counts.

[20] Exhibit 1, p. 15-16.

socialized with the employees.[21] Fernando Lopez testified that Mrs. Gonzalez took him to his appointment to get his driver's license and social security card and that the Gonzalezes "*would often throw parties*" for employees.[22] These statements are consistent with the statements of other employees interviewed by the defense.

The Facebook messages provided by the Government provide another particularly illustrative example of Mrs. Gonzalez's concern for her employees' well-being. The Gonzalezes utilized a third-party company called D&O Consulting to bring workers lawfully into the country pursuant to work visas, and the owner, Nancy, connected the prospective employees with a man named Santiago who then set up the employees in hotel rooms in Monterrey, Mexico while they waited to obtain their visas from the U.S. consulate.

While staying at one of these hotels, one worker, S.L., messaged Mrs. Gonzalez on Facebook complaining about the condition of the hotel rooms. The messages reflect that Mrs. Gonzalez contacted either Nancy, Santiago, or the hotel staff and demanded that the workers receive better rooms, before checking in with S.L. to ensure that this had happened.

---

[21] Exhibit 2, p. 26-27.

[22] Exhibit 3, p. 19-20.

2. <u>History and Characteristics of Mrs. Gonzalez</u>

Mrs. Gonzalez is a U.S. citizen. She owns her own home. She helped to run a successful business that employed many people. She has been married since 2007. And most importantly, she is raising two wonderful daughters, Aylin and Arleth, who miss her very much. Aylin testified at the detention hearing that she is 15 years old, is going into the tenth grade, and has a 4.0 GPA. Now going into her junior year, she is on the lacrosse team and is involved in five different extracurricular clubs. She testified that it was her mother who primarily took care of her and her sister and that her mother is her role model, describing Mrs. Gonzalez as "*very kind and patient*." Aylin also explained that the arrests have caused "*drastic changes*" in her and her sister's living situation.[23]

Notably, Alyin also spent considerable time at her parents' restaurants, and she testified that she has never seen either of her parents be violent or abusive toward anyone. She also explained that she knows the alleged victims personally, having spent time with them at the restaurants and the parties her parents threw for them, and that the allegation that her parents forced her to work at the restaurant is simply not true.[24]

---

[23] Transcript of Detention Hearing (06/28/2023, p. 60-64)

[24] Transcript Detention Hearing (06/28/2023, p. 65-69)

3. Affording adequate deterrence

Mrs. Gonzalez has been in custody for more than 15 months. She has been separated from her two minor daughters who love her very much. She has lost her family's business, and her husband will likely be deported and unable to return to the U.S. Her name was vilified in the media after numerous outlets reported on the Government's initial indictment, stating that she and her husband were charged with "immigration slavery."[25] It is unlikely that these same outlets will report that the Government has agreed to dismiss all of the charges in its initial indictment.

In short, Mrs. Gonzalez's life has been turned upside down, and things will never be the same for her and her family. Counsel contends that a sentence of time-served in such a case will provide adequate deterrence to both Mrs. Gonzalez as well as members of the public who would consider engaging in alien harboring.

4. The need to avoid unwarranted sentencing disparities

On page 41, the PSR notes that the average sentence for a defendant sentenced pursuant to § 2L1.1 with a total offense level of 18, excluding those who provided substantial assistance, is 23 months and that the median sentence is 24 months. In 54% of these cases, the defendant received a downward variance or departure.

---

[25] Univision. "Owners of Restaurant 'Sabor a Mexico' are arrested and accused of enslaving immigrants." May 25, 2023. https://www.univision.com/local/atlanta-wuvg/restaurante-sabor-mexico-georgia-esclavitud-inmigrantes

It is worth noting that Mrs. Gonzalez's guideline is § 2L1.1(a)(3), which has a base offense level of 12. The PSR's statistics include the base offense levels under subsections (a)(1) and (a)(2) of § 2L1.1, which have a much higher base offense level of 25. Because the JSIN database does not appear to distinguish between these different subsections, the average sentence under subsection (a)(3) is likely much lower.[26]

Looking at just the Northern District of Georgia, the U.S. Sentencing Commission's Interactive Data Analyzer shows that the § 2L1.1 guideline has been applied in ten reported cases since 2019. Half of these cases received probation. The other half received an average prison sentence of 17 months and a median prison sentence of 15 months.[27]

To date, Mrs. Gonzalez has served more than 15 months. With "good-time" credit, this amount of time equates to a sentence of approximately 18 months. Counsel contends that a sentence of time-served falls well within the heartland of sentences for the charged offense.[28]

---

[26] The average sentence for a total offense level of 13, which the defense contends is proper, is 12 to 18 months. At the Change of Plea hearing, Counsel recalls the Government advocating for a Guidelines range of 18 to 24 months.

[27] See, https://ida.ussc.gov/analytics/saw.dll?Dashboard

[28] The Commission's report on "alien smuggling" states that the average sentence is 15 months. See, https://www.ussc.gov/research/quick-facts/alien-smuggling#:~:text=Punishment,carrying%20a%20mandatory%20minimum%20penalty.

CONCLUSION

For these reasons, Counsel for Mrs. Gonzalez respectfully requests that the Court accept the terms of the plea agreement and sentence Mrs. Gonzalez to time-served.

This 23rd day of August, 2024.

                                          JESS JOHNSON LAW, LLC

                                          /s/ Jess B. Johnson

Jess Johnson Law, LLC                      Jess B. Johnson
1180 W Peachtree Street NW             GA Bar No. 322066
Suite 2075
Atlanta, Georgia 30309
(404) 855-1325
GA Bar No. 322066
jess@jessjohnsonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2024, a true copy of the foregoing Notice was filed electronically with the Court using the CM/ECF system, which will electronically send a notification of such filing to all parties.

This 23rd day of August, 2024.

JESS JOHNSON LAW, LLC

/s/ Jess B. Johnson
Jess B. Johnson
GA Bar No. 322066

Jess Johnson Law, LLC
1180 W Peachtree Street NW
Suite 2075
Atlanta, Georgia 30309
(404) 855-1325
GA Bar No. 322066
jess@jessjohnsonlaw.com